IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

SHELIA A. SMITH,
      Plaintiff,

vs.                                Case No. 5:09cv158/RS/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.* It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record, the undersigned concludes that the Commissioner's final determination is supported by substantial record evidence and is the result of the application of proper legal principles. It is therefore recommended that the decision of the Commissioner be affirmed.

I.      PROCEDURAL HISTORY

Plaintiff's applications for DIB and SSI were denied initially and upon reconsideration, and she appealed the denials to an administrative law judge ("ALJ"). The ALJ held a hearing on September 10, 2008, and in a decision dated October 30, 2008, found Plaintiff "not disabled" as that

term is defined in the Act (Tr. 609–26 (hearing); Tr. 16–25 (decision)).[1] The Appeals Council denied Plaintiff's request for review on January 23, 2009 (Tr. 8). Thus, the decision of the ALJ stands as the final decision of the Commissioner, now subject to judicial review. <u>Ingram v. Comm'r of Soc. Sec. Admin.</u>, 496 F.3d 1253, 1262 (11th Cir. 2007); <u>Falge v. Apfel</u>, 150 F.3d 1320 (11th Cir. 1998). This timely appeal followed.

II.     FINDINGS OF THE ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1)      In her applications for DIB and SSI Plaintiff alleged disability beginning August 27, 2002, and did not engage in substantial gainful activity since that time.

2)      Plaintiff met the insured status requirements of the Act through March 31, 2008 (thus, the time frame relevant to her claim for DIB is August 27, 2002 (alleged onset) through March 31, 2008 (date last insured)).

3)      Plaintiff had the following severe impairments during the relevant period: low back pain, obesity, asthma, and depression, but she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.[2]

4)      During the time frame relevant to this appeal Plaintiff could not perform any of her past relevant work but had the residual functional capacity ("RFC") to perform "light" work as defined in 20 C.F.R. § 404.1567(b), with the following exceptions: she required indoor work with a sit/stand option, she was limited to unskilled or low-end semi-skilled work, and she could have only occasional contact with the public.

5)      Transferability of job skills is not material to the determination of disability because use of the Medical-Vocational Rules as a framework supports a finding that Plaintiff was "not disabled," whether or not she had transferable job skills.

6)      Considering Plaintiff's work experience, age, "high school equivalent" education, and RFC, there were jobs existing in significant numbers in the national economy

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on July 17, 2009 (Doc. 11).

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, hereafter, citations in this Report should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

she could perform and, therefore, she was not under a disability from August 27, 2002, through October 30, 2008, the date of the ALJ's decision.

III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment

must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S WORK HISTORY, HEARING TESTIMONY, AND HISTORY OF PSYCHOLOGICAL TREATMENT; and TESTIMONY OF THE VOCATIONAL EXPERT

A.    Plaintiff's Work History and Testimony Regarding Her Impairments [3]

Plaintiff has past relevant work as a cook, dishwasher/kitchen helper, laundry worker, and resident care aide (Tr. 612–14).  As a resident care aide Plaintiff worked with mentally retarded children and performed such tasks as taking the children on errands and doing their laundry.  She was transferred within this job to care for adult residents and was injured when she was thrown against a brick wall by an adult male client (Tr. 613).[4]  After her injury Plaintiff held other employment, including work as a housekeeper, cook, and dishwasher, and she last worked—from approximately January 22, 2001, through August 27, 2002—as an "in-home support" worker/companion for Horizons of Okaloosa County (*see* Tr. 118).  In her capacity as an in-home support worker/companion, Plaintiff "sat" with Horizons' clients in their homes and occasionally assisted them with personal and household needs, such as grooming or housekeeping (*see* Tr. 119, 623–24).

Plaintiff testified at her hearing held September 10, 2008, that she is unable to work mainly due to lower back pain (Tr. 616–17).[5]  She noted that she has nerve damage in her right leg and experiences pain and numbness in the right leg down to her foot, she becomes stiff easily, she can sit about fifteen to twenty minutes and stand about five to ten minutes, and she cannot lift items such as milk or laundry detergent (Tr. 618).  Plaintiff also testified that she suffers from asthma, which causes difficulty breathing when she is outside.  With regard to daily activities, Plaintiff stated she is able to grocery shop with her husband's help and can shop for about forty-five minutes (Tr. 620).  Plaintiff further noted that she takes medication for depression, pain, anxiety, muscle spasms, and asthma, and she testified that she has taken antidepressant medication for approximately eighteen

_____

[3] Unless otherwise indicated the information in this section is derived from the ALJ's summary of Plaintiff's testimony (Tr. 21).

[4] Treatment records reflect that this incident occurred on July 7, 1987 (*see, e.g.*, Tr. 218).

[5] In a disability report dated August 13, 2004, Plaintiff noted that she was unable to work due to physical problems <u>and</u> depression, stress, and anxiety (*see* Tr. 95).  Moreover, the issues in the instant appeal concern only her mental impairments.  This Report, therefore, generally discusses only those impairments, although some information regarding her physical condition is included where relevant.

years (or, since about 1990) and noted that the medication "sometimes" helps her "stay focused and keep sort of going day-to-day" (Tr. 622).

B.      Psychological Treatment

Plaintiff was treated for a work-related injury from 1987 through 2003 by physicians at The Hughston Clinic (*see* Tr. 215–23).  Notes from the clinic dated May 28, 2003, reflect a report by Plaintiff that she had previously been diagnosed with anxiety and depression by "Dr. Ranik" and had been under his psychiatric care (Tr. 216).[6]

Plaintiff was treated by a mental health professional between March 2000 and January 2002 (*see* Tr. 266–70).[7]  "Treatment & Progress Notes" regarding this treatment reflect that at Plaintiff's first visit she reported having seen "Dr. Stokes" in 1989 or 1990 and that he (Dr. Stokes) believed Plaintiff had experienced panic attacks (Tr. 270).[8]  The progress notes also reflect, generally, Plaintiff's reports of traumatic events in her life and complaints of difficulty sleeping, stress, anxiety, and depression (*see* Tr. 268–70).  The notes also reflect that Plaintiff was prescribed medications, including Effexor and Celebrex, and that her medications were adjusted throughout the course of her treatment.  In December 2000 Plaintiff reported that her depression and sleeping difficulties were better, and in June 2001 Plaintiff reported that she was "not as depressed" (Tr. 269, 268).  The remaining progress notes, which reflect Plaintiff's visits on approximately a monthly basis through January 2002, appear to generally be the same (that is, they record Plaintiff's comments and subjective complaints and reflect that her medications were adjusted as needed) (*see* Tr. 266–68).

On January 19, 2002, Plaintiff was referred to Brent Decker, Ph.D., "by Dr. Renick for significant depression, recent grief reactions, as well as medical problems" (Tr. 264).  Plaintiff first reported that she was employed, full-time, as a home health care aide (*id.*).  Plaintiff then discussed

---

[6] The correct name of the physician appears to be John T. Renick, M.D. (*see, e.g.*, Tr. 265, 350); he will therefore be referred to as Dr. Renick in this Report.

[7] The treatment notes do not indicate who provided the treatment, but it appears to have been Dr. Renick because the last treatment record, dated January 15, 2002, notes that Plaintiff would be referred to Brent Decker, Ph.D., for evaluation and treatment, and on January 19, 2002, Dr. Decker evaluated Plaintiff upon referral from Dr. Renick (*see* Tr. 266, 264; *but see* Tr. 350 (a record from the Office of Disability Determinations indicating that Dr. Renick's records could not be obtained)).

[8] There are no records in the file from Dr. Stokes.

a number of problems and adjustments she had experienced in her life. For example, she reported that her house had caught fire about a year earlier. She also reported that her brother had recently died from a massive heart attack, seemingly precipitated by his use of methamphetamine and cocaine, and she noted that he had threatened to harm her and her family prior to his death (*id.*). Plaintiff further reported that "many years ago" another brother had committed suicide at the age of seventeen (*id.*). Lastly, Plaintiff noted that her husband had recently violated his probation and was incarcerated for several weeks (*id.*). It appeared to Dr. Decker that Plaintiff was struggling with "these grief reactions" and other upsetting events in her past (*id.*). He diagnosed Plaintiff with acute distress disorder and major depressive disorder, recurrent, moderate severity (*id.*). Dr. Decker recommended a thorough psychological evaluation to determine if Plaintiff was experiencing a post traumatic stress reaction and to address issues related to possible suicidal ideation; he also recommended supportive psychotherapy to reduce negative self statements and learn alternative coping methods (Tr. 265). Plaintiff returned to Dr. Decker on March 29, 2002, and reported "significant depression" and problems communicating with others (Tr. 263). Dr. Decker noted that Plaintiff had unresolved grief issues and seemed to feel very disconnected from others as a result of those issues (*id.*). He reviewed with Plaintiff "ways to reduce her suicidal thoughts and negative self statements" (*id.*). Plaintiff reported that she had been more anxious, but she also stated that her medications "were working" (Tr. 262). In June 2002, Dr. Decker noted that Plaintiff's depression level was "quite high" and that Plaintiff was "worried that if she ha[d] to quit working" it would cause "financial devastation" (Tr. 261). Plaintiff told Dr. Decker that she was doing well with her job, although she was concerned about "working past her physical abilities" (*id.*).

Plaintiff was treated by Thomas Derbes, M.D., in mid-2002, primarily for lower back pain, but he also conducted psychiatric examinations (*see* Tr. 203–14). In August 2002, following such an examination, Dr. Derbes opined that Plaintiff's affect was appropriate; her thought processes were clear, logical, and coherent; she had no looseness of association or tangential thinking, and no suicidal or homicidal ideations, delusions, or hallucinations; her judgment regarding everyday activities and social situations was good; her insight regarding her "present medical condition" was adequate; and she was awake, alert, and oriented to person, place and time (Tr. 208–09). Plaintiff's mood, however, was described as "somatic," and her memory was noted to be "poor" (Tr. 209). An

examination one week later resulted in the same findings, except Plaintiff's mood was described as "tearful," and no notation was made regarding Plaintiff's memory (Tr. 203–04).

On November 12, 2002, Plaintiff returned to Dr. Renick with complaints of daily panic attacks (Tr. 259). She reported that she and her husband had a "bad problem" with Dr. Derbes and that Dr. Derbes had "fired her" as a patient in August 2002 (*id.*). Dr. Renick wrote that Plaintiff was "unable to work due to depression and anxiety disorder" (*id.*).[9] The remaining treatment records (it is not entirely clear whether they are Dr. Renick's or Dr. Decker's) through August 2004, reflect occasional reports of anxiety, as well as adjustments to Plaintiff's medications (*see* Tr. 250–58). At Plaintiff's last visit, on August 11, 2004, it was noted that Plaintiff would be referred to a psychiatrist who would "take over" her treatment (Tr. 250).

Plaintiff was taken to an emergency room ("ER") on May 24, 2006, after her legs "gave way" as she was walking, and she fell "to her knees" (Tr. 395). Plaintiff's chief complaints were back pain, neck pain, and headaches, and she evidently reported that she was suicidal (*see* Tr. 390, 392, 395). ER staff noted that Plaintiff was alert and "oriented x3" (Tr. 396). Plaintiff was discharged the same day but thereafter was voluntarily admitted to the crisis stabilization unit ("CSU") of the Life Management Center ("LMC") (Tr. 471–72). Plaintiff reported to CSU staff that she was tired of being in pain and had planned to kill herself, although she stated she had never actually attempted suicide and had never been hospitalized in a mental health facility (Tr. 472). She also reported being depressed "for the past nine years" (that is, approximately since her on-the-job injury) (*id.*). Plaintiff was noted to be alert, cooperative, and oriented to time, person, place, and situation (*id.*). Her immediate memory was "good," her recent memory "poor," and her remote memory "fair"; her speech was fluent, coherent, and productive (*id.*). Plaintiff denied paranoia, hallucinations, or delusions. Edward Gibson, M.D., reported that Plaintiff also denied any suicidal ideation, which prompted him to comment that "she's obviously ambivalent as five minutes ago she

---

[9] Plaintiff characterizes this notation as Dr. Renick's opinion (*see* Doc. 17 at 4), but it is not clear whether he indeed so opined, or whether he merely recorded Plaintiff's belief that she was unable to work (*see* Tr. 259 (the notation immediately follows other statements made by Plaintiff)). However, on treatment records dated July, October, and December 2003, and March 2004, a box is checked describing Plaintiff's status, as a worker's compensation patient, as "unable to work" (*see* Tr. 254, 253, 252, 251) (the same box is not checked on the last treatment record from this provider, dated August 2004 (*see* Tr. 250)). Thus, the notation likely reflects the doctor's opinion, as Plaintiff has stated.

stated that she had a plan to kill herself" (*id.*). Dr. Gibson's diagnostic impressions were mood disorder secondary to a generalized medical condition and over-sedation secondary to sedating medications (Tr. 473). He assessed Plaintiff with a Global Assessment of Functioning ("GAF")[10] score of 35 upon admission to the CSU and 55 for the past year (*id.*).[11] Plaintiff was released from the CSU two days later, on May 26, 2006, with a prescription for Effexor (Tr. 462–63).

Plaintiff had previously been treated by Michael G. Foley, M.D. (since approximately March 2002), primarily for certain physical conditions, including asthma, chest pain, generalized swelling, weakness, and back pain (*see, e.g.*, Tr. 578, 574, 570, 528),[12] and she returned to him following her release from the CSU. On June 20, 2006, in describing Plaintiff's mood, Dr. Foley noted that she was crying, and although his treatment continued to primarily focus on Plaintiff's physical conditions, he indicated a diagnosis of depression (Tr. 500–01). Plaintiff saw Dr. Foley on a

---

[10] GAF is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994). It may be expressed as a numerical score. *Id.* at 32. A score between **31 and 40** reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). *Id.* A score between **41 and 50** reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A score between **51 and 60** reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

[11] Just prior to Plaintiff's admission to the CSU and evaluation by Dr. Gibson, Plaintiff was interviewed by Rachel Jarboe, a licensed mental health counselor with the LMC (*see* Tr. 464–71). Ms. Jarboe noted that Plaintiff's husband reported that she had attempted suicide, but Plaintiff denied attempting suicide and stated only that she previously "thought" of doing so (*see* Tr. 464–65). Plaintiff advised that she had applied for disability "numerous times" and was presently in the appeals process. Ms. Jarboe assessed Plaintiff with major depressive disorder, recurrent, severe, secondary to chronic pain; she noted that Plaintiff was unable to work "due to pain" and assessed Plaintiff with a GAF score of 20 (Tr. 468, 470) (in relevant part, a GAF score between **11 and 20** reflects some danger of hurting oneself or others (e.g., suicidal attempts without clear expectation of death; frequently violent; manic excitement) Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994))).

[12] Dr. Foley's earlier treatment notes indicate that Plaintiff was receiving mental health treatment, as well as prescriptions for anxiety and depression, from another provider (*see, e.g.*, Tr. 578, 570), but his more recent treatment records, including those from 2004–2005, suggest that at some point he began prescribing such medications, including Wellbutrin, Effexor , and Seroquel (*see, e.g.*, Tr. 546, 537, 519, 517). Likewise, his more recent treatment notes often reflect diagnoses of depression and /or anxiety, in addition to diagnoses related to Plaintiff's physical condition (*see, e.g.*, Tr. 535, 533, 525, 519).

monthly basis through October 2006, and his treatment notes from that time frame are generally the same, reflecting in relevant part occasional diagnoses of depression and renewal of Plaintiff's prescriptions for Wellbutrin and Effexor (*see, e.g.*, Tr. 500, 498, 497, 496), although it does not appear that Plaintiff was diagnosed with anxiety during this time frame (*see* Tr. 490–98).

Plaintiff was evidently admitted to the CSU again, on or shortly after September 29, 2006, based upon a reported suicide attempt or a belief that Plaintiff was "suicidal" (*see* Tr. 457–61).[13] Plaintiff was discharged on October 2, 2006, with prescriptions for Effexor and Valium, and she was advised to follow-up with Dr. Foley (Plaintiff reported that she would arrange her own follow-up with a "psychiatrist out of Chattahoochee") (Tr. 457).

On or about October 8, 2006, Plaintiff presented to the office of "Linzey Faison, ARNP, BC and Associates, Inc." in Chattahoochee, Florida (Tr. 483). Plaintiff reported that she smoked one to three marijuana cigarettes per day for pain and anxiety (Tr. 479, 486). Plaintiff also reported that she began experiencing depression in approximately 1989 (or, since about two years after her work-related injury) (Tr. 479). Aileen Humphrey, an advanced registered nurse practitioner ("ARNP"), noted that Plaintiff provided conflicting reports regarding her worker's compensation claim and was "considered to be involved in insurance fraud," as her stated degree of pain was inconsistent with the 1987 work-related injury (Tr. 487). Upon mental status examination, ARNP Humphrey noted that Plaintiff was alert and cooperative, but she was also noted to be anxious, tearful, sad, depressed, irritable, and apprehensive (Tr. 487–88). Plaintiff's speech rate was "decreased" and its content "soft," but her speech was logical and goal directed, her psychomotor status was normal, she was fully oriented, her memory and attention were "adequate," and her abilities to calculate and abstract were "intact" (*id.*). ARNP Humphrey also noted that Plaintiff's affect was appropriate and that she evidenced no psychotic symptomatology, homicidal ideation, or suicidal ideation (indeed, Plaintiff

---

[13] On September 29, 2006, Dr. Swiney, a psychiatrist at the LMC, and Kenneth Chisholm, a licensed mental health counselor at the LMC, along with Dr. Gibson, signed petitions seeking Plaintiff's involuntary placement in the CSU (that is, they initiated "Baker Act" proceedings) (*see* Tr. 459, 461), and a hearing was scheduled for October 5, 2006 (Tr. 458). However, it does not appear that a hearing took place or that Plaintiff was involuntarily committed, because there no evidence of any such commitment in the file, and paperwork from the CSU reveals that Plaintiff was released on October 2, 2006 (Tr. 457; *see also* Tr. 479 (reflecting a report by Plaintiff that she "was able to sign herself out" the CSU on October 2)).

reported that she "th[ought] about" suicide but had never "acted on it" and had no plan to do so) (Tr. 488). ARNP Humphrey diagnosed Plaintiff with post traumatic stress disorder and major depressive disorder, chronic, severe, with psychotic features, and assessed a GAF score of 51 (*id.*). Plaintiff was prescribed medications including Wellbutrin, Abilify, and Tranxene, and she was advised to taper off Effexor, discontinue Valium, and return in one week (Tr. 482). Plaintiff returned on November 7, 2006, and again saw ARNP Humphrey (Tr. 474–76). Plaintiff reported that the Effexor was working "good," that her sleep was better, and that she was not "get[ting] as depressed as [she] did," but she stated that she was "having a lot of problems" with anxiety and that her "nerves [were] killing [her]" (Tr. 474–75). ARNP Humphrey noted inconsistencies between certain reports by Plaintiff during her two office visits and commented that Plaintiff was an "unreliable source of information" (Tr. 475). She also noted that Plaintiff was tearful throughout the interview and constantly rubbed and scratched her arms; she commented, though, that Plaintiff might have been exaggerating and that such scratching and rubbing may not have been necessary (*see* Tr. 476). There are no other records from Linzey Faison's office.

On two occasions, March 19, 2008, and April 18, 2008, Plaintiff was seen at the Bond Community Health Center (Tr. 605–08).[14] At the first visit, Plaintiff reported a history of hypertension, anxiety, depression, and chronic back pain; her medications were adjusted and refilled (Tr. 607). At the second visit Plaintiff primarily complained of cough and congestion, although her history of anxiety and depression was again noted, and her medications were continued (Tr. 605).

C.      Opinions of Examining and Non-Examining Consultative Psychologists

On December 2, 2004, Plaintiff was referred to Kent Rowland, Ph.D., by the Office of Disability Determinations ("ODD") for a psychological assessment (Tr. 359). Plaintiff reported that she was unable to work due to "acute anxiety disorder and stress," as well as back pain (*id.*). On mental status examination, Plaintiff maintained good eye contact, attained an adequate rapport, and

---

[14] The handwritten "Progress Notes" for each visit reflect Plaintiff's name and date of birth (Tr. 607), but the typewritten record of Plaintiff's March visit (Tr. 606) may not be Plaintiff's record, as it refers to the patient as a male and contains medical and other information that does not appear to accurately describe Plaintiff (*see* Tr. 606). Thus, the undersigned relies only on the handwritten progress notes in discussing Plaintiff's March visit.

was alert and oriented to person, place, and circumstances (Tr. 360–61). Dr. Rowland tested Plaintiff in the areas of attention, concentration, and memory, and she displayed both weaknesses and strengths in those areas (*see id.*). He noted that Plaintiff's flow of ideation was somewhat slowed, but it was logical and purposeful, and he described Plaintiff's judgment as "low average" and her insight as "[possibly] limited" (Tr. 361). Plaintiff did not evidence any paranoia or delusional, suicidal, or homicidal ideation; nor did she display hopelessness or helplessness, but her affect was "flattened" (*id.*). Dr. Rowland diagnosed Plaintiff with major depressive disorder, recurrent, severe; panic disorder with agoraphobia; and "R/O [rule out]" reading disorder and borderline intellectual functioning; he assessed a GAF score of 50 (*id.*). Dr. Rowland noted that Plaintiff has held employment in the past which indicates that she probably functions in the low average range of intelligence, although her performance on the mental status examination was in the borderline range, possibly because of over-medication (Plaintiff told Dr. Rowland she had taken "two 10 mg Valiums" prior to the evaluation to reduce her anxiety) (Tr. 360–62).

On December 16, 2004, William Himadi, Ph.D., a non-examining agency physician, completed a Mental RFC Assessment form (Tr. 363–66). Dr. Himadi evaluated Plaintiff's mental abilities in the following general categories: understanding and memory, sustained concentration and persistence, social interaction, and adaptation (Tr. 363–64). In each category, Dr. Himadi was given the following choices regarding twenty specific mental abilities: not significantly limited, moderately limited, markedly limited, no evidence of limitation in the category, or not ratable on available evidence[15] (*id.*). Dr. Himadi found that Plaintiff was moderately limited in four areas (ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods), but in the sixteen remaining areas Dr. Himadi found that Plaintiff was not significantly limited (*id.*). Dr. Himadi also completed a Psychiatric Review Technique Form ("PRTF"), on which he opined that Plaintiff had two medically

---

[15] The five choices are referred to as "summary conclusions," and they are selected simply by checking a box (*see, e.g.*, Tr. 363). The last page of the form, however, contains a section requiring the assessor to explain in narrative form the summary conclusions (*see, e.g.*, Tr. 365).

determinable impairments (depressive disorder, not otherwise specified ("NOS"), and anxiety disorder, NOS), but concluded that neither impairment satisfied the diagnostic criteria of the Listings (Tr. 367–80). Specifically, Dr. Himadi found that the criteria of Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders) were not met because—in relevant part—Plaintiff had only mild or moderate functional limitations as a result of her mental impairments (Tr. 377). In conclusion, Dr. Himadi opined that Plaintiff had the mental capacity to "attend to a basic range of" activities of daily living and relate to others in a socially acceptable manner (Tr. 379). He acknowledged that Plaintiff's cognitive processing was somewhat obtunded during the evaluation by Dr. Rowland but noted that this might have been due to her use of Valium prior to evaluation (*see id.*). Dr. Himadi also opined that Plaintiff's daily functioning appeared limited primarily due to her physical status, and although Plaintiff likely had some limitations in intellectual functioning, she "retain[ed] sufficient adaptive skills for simple, routine, repetitive task performance on a sustained basis" (*id.*).

At the request of the ODD, Plaintiff was examined by Lawrence V. Annis, Ph.D, on August 22, 2006 (Tr. 435–38). Plaintiff reported that she could not work because of health problems, but if she could work again she would prefer to "sit with elderly people." Plaintiff claimed that her driving was limited due to panic attacks, which caused chest pain and made her feel as if she could not breathe. Plaintiff stated that at home she did nothing but sit on the couch and watch television; she wanted to sleep all day, did not want to be around anyone, and cried every day. She stated she became suicidal when her pain "became bad" and that she thought about suicide many times a day. Dr. Annis noted that Plaintiff's attire, grooming, and hygiene were appropriate; her speech was spontaneous and easily understood, but it was slow and poorly articulated; she appeared to understand comments and questions without difficulty; her thought expression was rational and coherent but often emotional; her verbal structure was logical and relevant; she exhibited no looseness of association, neologisms, word salad, flights of ideas, rambling speech, or delusional thinking; she displayed normal concentration and attention abilities but reported memory difficulties; and she was oriented to time, place, person, and situation. Dr. Annis noted that Plaintiff was preoccupied with physical problems and physical discomfort; she was apprehensive regarding relationship issues, finances, and her future; her "mood expression" was "depressed and anxious";

and she was repeatedly tearful during the evaluation. Dr. Annis diagnosed Plaintiff with mood disorder due to a general medical condition with depressive features and unspecified below average intelligence. In discussing Plaintiff's prognosis, Dr. Annis noted that he expected "some degree of depression" to continue for the foreseeable future, but he thought Plaintiff might feel better about herself and more in control of her life if she participated in outpatient treatment and took psychotropic medications. With regard to social functioning, Dr. Annis opined that Plaintiff appeared to be able—to a limited degree—to interact appropriately with people she did not know, but he noted she was socially handicapped by depression and anxiety and that her mental condition would be expected to reduce her ability to participate in social interactions requiring patience in difficult situations. Lastly, regarding Plaintiff's ability to perform work-related activities, Dr. Annis opined that Plaintiff would require more encouragement than others when encountering work difficulties or social challenges; he noted that she would not do well in occupations requiring frequent, protracted or demanding social interaction, such as work as a receptionist, restaurant server, cashier, or sales clerk; he opined that she should avoid employment at occupations requiring technical precision, driving, operating machinery, or contact with dangerous substance; and he suggested that Plaintiff would likely perform better in vocations that deal mainly with "things," such as word processing, dishwashing, data entering, or cleaning (assuming her physical condition permitted such work) (*id.*).

Thomas Conger, Ph.D., a non-examining agency physician, completed a Mental RFC Assessment on August 29, 2006, and was given the same choices as Dr. Himadi (Tr. 453–56). Dr. Conger found that Plaintiff was underlined moderately limited in two areas (the ability to maintain attention and concentration for extended periods and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods), and in the eighteen remaining areas Dr. Conger found that Plaintiff was not significantly limited (Tr. 453–54). Dr. Conger also completed a PRTF, on which he opined that Plaintiff had one medically determinable mental impairment (adjustment disorder with mixed emotional features), but it did not meet the criteria of Listing 12.04 because—in relevant part—Plaintiff had only mild or moderate functional limitations (Tr. 442, 449). In reaching his conclusions Dr. Conger noted that Plaintiff appeared to be limited by her physical

condition and pain to some extent, but she had the mental ability to perform routine activities of daily living within her physical restrictions. He also noted that although Plaintiff "may experience some depression and/or anxiety symptoms related to her medical problems and life circumstances, she remain[ed] functional from a mental perspective [and was] able to relate in a socially appropriate manner and appear[ed] to be primarily limited by her physical difficulties" (Tr. 451).

Joseph Peterson, Ph.D., J.D., another non-examining agency physician, completed a Mental RFC Assessment on December 5, 2006, and was given the same choices as Dr. Himadi and Dr. Conger (Tr. 579–82). Dr. Peterson found that Plaintiff had no evidence of limitation in five areas of mental functioning (ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to accept instructions and respond appropriately to criticism from supervisors, ability to respond appropriately to changes in the work setting, and ability to set realistic goals or make plans independently of others) (Tr. 579–80). He opined that she was moderately limited in two areas (ability to maintain attention and concentration for extended periods, and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods), and in the thirteen remaining areas Dr. Peterson found that Plaintiff was not significantly limited (*id.*). Dr. Peterson also completed a PRTF, on which he opined that Plaintiff had two medically determinable impairments (adjustment disorder with mixed emotional features and personality disorder) but neither met a listed impairment because—in relevant part—Plaintiff had "no" or only "moderate" functional limitations (*see* Tr. 593). In support of his findings Dr. Peterson noted, in part, that Plaintiff's "actual" psychological history is limited to some out-patient contacts with a local community mental health center between 2000 and 2002 and a brief admission to the CSU in July 2006,[16] with subsequent out-patient services "confined to a supportive/palliative/ med[ication] maintenance role (mostly via [an] ARNP &/or non-psych[ologist/psychiatrist]" (Tr. 581). He also noted that Dr. Annis' findings are contraindicative of any diagnosable mental disorder beyond mild to moderate adjustment reaction, arising within a "generally unhappy/dissatisfied/dysthymic individual" who resided independently with her spouse, daughter,

---

[16] As previously discussed, it appears that Plaintiff was also briefly admitted to the CSU in late September or early October 2006, but the records surrounding that admission are somewhat confusing (*see* footnote 13 *supra*).

and grandchild and who "continue[d] to function adequately in a full range of routine [activities of daily living within] her physical [and] motivational/volitional parameters" (*id.*). Lastly, he opined that Plaintiff "may be considered still able to sustain the mental demands of appropriate concentrated task-oriented activity at this time" (*id.*).

D.     Testimony of the Vocational Expert

At Plaintiff's hearing the ALJ asked the Vocational Expert (VE) to characterize Plaintiff's past relevant work. In response, he characterized the work as follows:

1)     Cook/Fast Food Worker—Dictionary of Occupational Titles ("DOT") # 313.374-010—a medium, skilled job with an SVP[17] of 5;

2)     Dishwasher/Kitchen Helper—DOT # 318.687-010—a medium, unskilled job with an SVP of 2;

3)     Laundry Worker/Machine Washer—DOT # 361.665.010—a medium, semi-skilled job with an SVP of 4;

4)     Home Health Aide (the job with Horizons)—DOT #3 09.667-010—a light to medium, semi-skilled job with an SVP of 3 (but, as performed by Plaintiff, "Companion," a light/sedentary, semi-skilled job with and SVP of 3); and,

5)     Resident Care Aide (the job where Plaintiff incurred the on-the-job injury in 1987)—DOT # 355.377-018—a medium, semi-skilled to skilled job, with an SVP of 4 to 6.

(Tr. 611–12, 614).

The ALJ then asked the VE whether jobs existed for a hypothetical individual of Plaintiff's age, with Plaintiff's past relevant work experience, education, and RFC (Tr. 623). The VE first responded by noting that the individual could likely perform Plaintiff's past job as a home health aide as previously performed by Plaintiff, or companion as defined and as previously performed (*see* Tr. 623–24). The VE also testified that the hypothetical individual would be able to perform the requirements of other occupations available both regionally and nationally, including:

1)     Office Helper—DOT # 239.567-010—a light, unskilled job with an SVP of 2;

2)     Mail Clerk—DOT # 209.687-026—a light unskilled job with an SVP of 2;

---

[17] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 . . . , unskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9 in the DOT." Social Security Regulation 00-4p

3)  Surveillance System Monitor—DOT # 379.367-010—a sedentary, unskilled job with an SVP of 2; and,

4)  General Clerk—DOT # 209.562-010—a light, semi-skilled job with an SVP of 3.

(Tr. 623–25).

Lastly, Plaintiff's attorney asked the VE to consider the same hypothetical individual, but who would additionally need to lie down during the workday (in other words, would need a "sit/lie" option) and/or who would need to lie down on an hourly basis (Tr. 625). The VE responded that such an individual could not work (*see id.*). Likewise, the VE opined, if the individual routinely missed more than one day of work per month, the individual could not sustain employment (*see* Tr. 625–26).

V.     DISCUSSION

Plaintiff raises three issues in the instant appeal (some of which contain numerous sub-issues), which are rearranged in this Report for organizational purposes. First, Plaintiff contends the ALJ erred in finding her allegations of mental limitations less than fully credible. Second, Plaintiff contends the ALJ's mental RFC determination is erroneous. Third, Plaintiff alleges the ALJ erred by failing to comply with Social Security Regulation ("SSR") 00-4p and SSR 96-9p.

A.     Plaintiff Allegations Regarding Her Mental Limitations

Initially, it is evident from the ALJ's opinion that he applied the correct standard in evaluating Plaintiff's subjective complaints (*see* Tr. 21 (citing 20 C.F.R. § 404.1529)); *see also* Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002) (the Eleventh Circuit has approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard"). Indeed, Plaintiff does not dispute that the ALJ applied the correct standard. Rather, Plaintiff asserts that the ALJ's reasons for discounting her complaints are unsupported by the record (*see* Doc. 17 at 21–24).

The ALJ generally found that Plaintiff's allegations regarding her physical and mental symptoms and limitations were not credible to the extent those allegations preclude her from performing all work activity (Tr. 22). In support, largely regarding Plaintiff's complaints of physical limitations and pain, the ALJ noted Plaintiff's conservative treatment, failure to undergo surgery as

advised, non-compliance with physical therapy, and providing of inconsistent information, as well as the effectiveness of Plaintiff's medications and lack of supporting objective medical evidence (findings that are not at issue in this appeal) (*id.*). As to Plaintiff's "alleged problems stemming from her mental impairments," the ALJ cited three additional reasons for finding Plaintiff less than fully credible (*id.*). First, the ALJ found that although Plaintiff was assessed with a GAF score of 35 upon her admission to the CSU in May 2006, her "more recent" GAF scores indicate only moderate impairment (*id.*). Second, the ALJ considered that Plaintiff's mental conditions can be managed with proper medication, and third, that she was not seeing a mental health professional at the time of her hearing (and had not done so for some time prior to her hearing) (*id.*).

Plaintiff asserts error as to each of the three reasons cited by the ALJ. As to his reason concerning her GAF scores, Plaintiff notes that the ALJ made the following comment in another section of his opinion (that is, in his discussion of the weight to be assigned to certain medical opinions in the record): "When [Plaintiff] underwent a psychological assessment by Dr. Rowland in 2004, he indicated that her GAF score was 50 indicating moderate limitations." (Doc. 17 at 22 (citing Tr. 22)). Plaintiff argues that a score of 50 indicates "serious" symptoms, not "moderate" symptoms as the ALJ stated. Plaintiff is correct, but the ALJ's misstatement did not affect his analysis of Plaintiff's credibility. In articulating this reason, the ALJ specifically stated as follows: "When [Plaintiff] was hospitalized for suicidal ideation in May 2006, her GAF score was 35. More recent GAF scores have shown only moderate impairment." (Tr. 22) (emphasis added). Thus, the ALJ's credibility finding concerns GAF scores assessed after May 2006, not the GAF score assessed by Dr. Rowland in 2004. Moreover, the record supports the ALJ's finding. For example, in October 2006 ARNP Humphrey assessed a GAF score of 51 (Tr. 488). Similarly, the non-examining agency consultants who rendered opinions after May 2006 (that is, Dr. Conger, in August 2006, and Dr. Peterson, in December 2006) found no more than "moderate" functional limitations in Plaintiff's social or occupational functioning. Thus, the ALJ's finding is consistent with, and supported by, the record. Moreover, although the ALJ's finding here focused only on Plaintiff's "more recent" GAF scores, the undersigned notes that other scores assessed (and opinions offered) during the relevant period, other than Dr. Rowland's score, also reflect—at most—only "moderate" impairment. For example, Dr. Gibson opined in May 2006 that Plaintiff's GAF was 55 during the

"past year," or from approximately May 2005 to May 2006 (Tr. 473). Similarly, in December 2004 Dr. Himadi found no more than "moderate" functional limitations (Tr. 363–64, 377). Thus, the ALJ's finding—that Plaintiff's complaints are not credible to the extent they suggest more than moderate functional limitations because such complaints are inconsistent with the record as a whole (or more specifically, the GAF scores of record)—is substantially supported by the record, despite the one GAF score of 50 that exists in the record.[18]

Plaintiff next contends that her mental conditions were not managed with medication, and the ALJ therefore erred in discounting her complaints on this basis (Doc. 17 at 22). In support Plaintiff points to only two pages in the entire 626-page record (*see id.* (referencing Tr. 257 and 362)). Plaintiff's <u>first</u> reference is to a notation in a treatment record dated March 17, 2003, that Plaintiff was then on "a combination of antidepressants to stay within PDR dosing schedule in consideration of possible legalities" (*see* Doc. 17 at 22 (citing Tr. 257)). Plaintiff contends this notation implies that the treatment provider (it is unclear who made this notation) believed Plaintiff "needed higher off-label dosages or medications to control her symptoms" (Doc. 17 at 22). Plaintiff, however, is merely speculating, and such speculation does not undermine the ALJ's finding. Moreover, in the same treatment record the provider also wrote that Plaintiff was on "a lot of medication" and "need[ed] to see [a] surgeon and get some resolution" (Tr. 257). Thus, if the treatment provider believed Plaintiff's medications were ineffective—as Plaintiff contends—he appears to have believed they were ineffective in controlling her <u>physical</u> symptoms since he wrote that a <u>surgical</u> consult was necessary. Indeed, in another notation made the same day, the treatment provider noted that Risperdal had decreased Plaintiff's psychotic symptoms (*id.*). Additionally, in the next treatment record, dated April 17, 2003, the provider noted that Plaintiff's mood was "O.K.," and Celebrex was discontinued, and on the last treatment record from this provider, dated August 11, 2004, Plaintiff's emotions were described as "appropriate," she was noted to be "fairly stable," and the box titled "unable to work" was not checked (Tr. 256, 250). Thus, the treatment record

---

[18] As noted *supra*, just prior to Plaintiff's admission to the CSU, a counselor assessed a GAF score of 20, but immediately thereafter Dr. Gibson assessed a much higher score and noted inconsistencies in Plaintiff's reports. Moreover, the ALJ acknowledged that upon admission to the LMC Plaintiff was assessed with a low GAF score. Indeed, Plaintiff sets forth no arguments in the instant appeal based on the counselor's GAF score of 20.

referenced by Plaintiff does not establish that her medications were ineffective. Indeed, when that treatment record is considered in its entirety, and in conjunction with subsequent records from the same provider, it actually provides support for the ALJ's finding that Plaintiff's mental conditions could be managed with proper medication. Likewise, a record dated October 17, 2006, specifically states that Plaintiff's symptoms improved with medication changes and clinic support (Tr. 477; *see also* Tr. 478 (noting Plaintiff's improvement with medication, such as a brighter affect, decreased apprehension, calmness with more relaxed posturing, increased verbal interaction, decreased facial and body tension, and no crying)). Plaintiff's <u>second</u> reference to the transcript is to a comment made by Dr. Rowland on December 2, 2004, that Plaintiff "has been dealing with mood and anxiety problems for well over 10 years . . . . [Her] current treatment appears to be ineffectual in impacting upon her <u>mood difficulties</u>" (Doc. 17 at 22 (citing Tr. 362) (emphasis added)). Although Dr. Rowland did so comment, the undersigned notes that his comment is not a definitive statement; rather, Dr. Rowland noted that "it appeared" Plaintiff's medications were not helping her mood. Plaintiff's treatment records, though, indicate that her medications were generally helpful, as the ALJ found. For example, in addition to those records just discussed (including the record that specifically notes that Plaintiff's <u>mood</u> was "O.K.," and which was created prior to Dr. Rowland's evaluation), other treatment records also support the ALJ's finding. For example, Plaintiff reported in December 2000 that her depression and sleeping difficulties were better, in June 2001 that she was "not as depressed," and in March 2002 that the Effexor and Wellbutrin were "working" (Tr. 269, 268, 262). Importantly, it does not appear that Dr. Rowland reviewed these records, or any others, prior to his evaluation of Plaintiff and, therefore, his opinions appear to be based largely on Plaintiff's statements and demeanor during the evaluation (*see* Tr. 359–62). Further, Dr. Rowland specifically noted that Plaintiff was under the influence of Valium during his evaluation, which might have affected her mental faculties. Notwithstanding, Dr. Rowland did not conclude the Plaintiff was precluded from all work or otherwise "disabled" (*see id.*).

In sum, while the record reflects that adjustments to Plaintiff's medications were often necessary, the treatment records as a whole do not suggest that her medications simply were not effective or that more intensive treatment was necessary or recommended. Thus, the ALJ's finding—that Plaintiff's mental condition could be managed with proper medication—is

substantially supported by the record, and the two pages in the record identified by Plaintiff do not undermine the finding.

Plaintiff next contends the ALJ erred in considering that she was not seeing a mental health professional because he failed to consider <u>why</u> she was not pursuing such treatment (Doc. 17 at 22–23 (citing SSR 96-7p, which provides in relevant part that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.")).  Although Plaintiff's argument is somewhat unclear, she appears to acknowledge that she failed to pursue professional mental health treatment throughout the relevant period but suggests she failed to do so because she could not afford such treatment (*see* Doc. 17 at 22–23).  Specifically, in support of her argument, Plaintiff states as follows:

> [Plaintiff] had received mental health counseling and treatment in the past, when covered by workers' compensation. *See* ([Tr.] 250–71).  However, when a dispute with workers' compensation occurred, [Plaintiff] was discharged by Life Management, and had no covered treatment options. ([Tr.] 470) ("spoke with BMBHC – they are refusing to take client due to unsure about workman's comp[")]. [Plaintiff] was not being covered by workers' compensation, but was unable to receive private/charity treatment due to the workers' compensation coverage dispute. ([Tr.] 464–65).

(Doc. 17 at 22–23).  Plaintiff, however, has not explained how the worker's compensation dispute prevented her from obtaining any type of "private/charity treatment" (even if, as Plaintiff asserts, it prevented her from obtaining treatment at "BMBHC"), and the undersigned is aware of no circumstance that would prevent a person involved in such a dispute from seeking private or charitable treatment.  Indeed, the attempted referral to BMBHC (referenced by Plaintiff, *supra*) was made on May 24, 2006 (*see* Tr. 470), but Plaintiff received treatment at the LMC, Linzey Faison's office, and the Bond Community Health Center ("Bond") after the attempted referral, just as Plaintiff had received treatment from various providers prior to the attempted referral.  Thus, the record does not support Plaintiff's apparent assertion that she was unable to receive treatment due to a workers' compensation dispute.  Thus, the ALJ did not err in failing to consider "any explanations that the individual may provide . . . that may explain infrequent or irregular medical visits or failure to seek

medical treatment," SSR 96-7p, because Plaintiff has offered no legitimate explanation for her failure to seek regular treatment (and/or her failure to seek regular treatment from a mental health specialist).[19] Furthermore, Plaintiff's failure to seek such treatment was a factor properly considered by the ALJ in weighing the credibility of Plaintiff's complaints. *See* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to objective medical evidence, it is proper for ALJ to consider use of pain-killers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing); Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) (failure to seek medical treatment for a long time during a claimed period of disability tends to indicate tolerable pain). Accordingly, the ALJ did not err.

In conclusion, the ALJ specifically articulated the inconsistencies on which he relied in discrediting Plaintiff's subjective complaints, and his findings are supported by substantial evidence on the record as a whole; therefore, the ALJ's credibility finding should be affirmed. *See* Foote, 67 F.3d at 1561–62 (a clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court).

Before discussing Plaintiff's next ground for relief, however, one final contention regarding the ALJ's credibility determination must be addressed. Plaintiff asserts that the ALJ erred by considering a lack of objective verification of her daily activities in discounting her complaints of mental limitations (Doc. 17 at 23–24 (citing Tr. 23)). It appears to the undersigned, however, that the ALJ considered Plaintiff's daily activities only in discounting her complaints of pain and debilitating physical limitations (*see* Tr. 23), and the issues raised in this ground for relief concern only her reported mental limitations. Notwithstanding, to the extent the ALJ considered the lack of objective verification of Plaintiff's daily activities in discrediting her complaints of mental

---

[19] It should be noted, as Plaintiff appears to concede, that the record supports the ALJ's finding regarding Plaintiff's lack of treatment. As previously outlined, Plaintiff rarely sought treatment from a mental health professional, such as a psychologist or psychiatrist. Moreover, Plaintiff did not regularly seek mental health treatment. Her last visit with Dr. Foley (who is not a mental health specialist but did provide medications for depression and/or anxiety) was in October 2006, and she last received treatment from a mental health provider on November 7, 2006, when she appeared for a second and final visit at Linzey Faison's office (the two visits to Bond in March and April 2008 were primarily for treatment of physical conditions, and other than those two visits the record contains no evidence of any treatment—for physical or mental issues—for nearly two years, between November 2006 and September 10, 2008, the date of Plaintiff's hearing before the ALJ). Moreover, Plaintiff did not present any additional treatment records to the Appeals Council; rather, she pursued an appeal based on an assertion that the ALJ failed to "consider [her] pain" (*see* Tr. 8–10, 11).

limitations, and he erred in doing so, any error is harmless. The other reasons articulated by the ALJ for discounting Plaintiff's complaints of mental limitations are fully supported by the record and—standing alone—provide substantial support for discounting the complaints. Accordingly, Plaintiff is not entitled to relief on this claim.

       B.     Mental Residual Functional Capacity Determination

Plaintiff alleges the ALJ erred in determining her mental RFC, in part, because he included only one mental limitation in the RFC (that is, only "occasional" contact with the public) (Doc. 17 at 15–19 (citing Tr. 21)). Plaintiff also contends that the ALJ in failing to consider all the evidence of record and improperly rejected certain opinions in determining the RFC (*see* Doc. 17 at 15, 18). Lastly, Plaintiff contends the ALJ erred by failing to fully develop the record before determining the RFC (*see* Doc. 17 at 15, 18–19).

As this court is well aware, RFC is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite her impairments. *See* Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). As stated in 20 C.F.R. § 404.1545(a), it is the most a claimant can still do despite her limitations. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Although the RFC determination is a medical question, it is not based only on "medical" evidence, that is, evidence from medical reports or sources; rather, an ALJ has the duty, at step four, to assess RFC on the basis of all the relevant, credible evidence of record. *See* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); Dykes v. Apfel, 223 F.3d 865, 866-67 (8th Cir. 2000) (per curiam) (RFC is a determination based upon all the record evidence, but the record must include some medical evidence that supports the RFC finding). *See also* 20 C.F.R. § 404.1545; SSR 96-8p. Moreover, hypothetical questions, including those that reference an RFC, must comprehensively describe a plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence. Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985). However, the ALJ is not required to include findings in the hypothetical that

he has properly rejected as unsupported.  *See* <u>McSwain v. Bowen</u>, 814 F.2d 617, 620 n.2 (11th Cir. 1987).

Here, the ALJ determined, and included in the hypothetical question posed to the VE, the following RFC:  an ability to perform light, unskilled or low-end semi-skilled indoor work, with only occasional contact with the public[20] (Tr. 20–21, 623).  Thus, the mental RFC determination does not include only one limitation (that is, "occasional contact with the public") as Plaintiff contends, because it necessarily includes the additional mental limitations associated with unskilled or low-end semi-skilled work.  The question thus becomes whether the RFC determination is supported by substantial evidence in the record as a whole and whether the ALJ's hypothetical question to the VE, which included Plaintiff's RFC, comprehensively described her condition.

Plaintiff raises several arguments in support of her assertion that the RFC determination is erroneous.  First, Plaintiff contends the ALJ erred because he gave "significant weight" to the opinion of Dr. Peterson "in Exhibit B24F [Tr. 579–81]" but "failed to include the limitations noted in that opinion in the hypothetical question" (Doc. 17 at 15).  As previously noted, the Mental RFC Assessment form contains twenty specific areas of mental functioning that are to be assessed, and Dr. Peterson concluded that Plaintiff had "no evidence of [any] limitation" or was "not significantly limited" in eighteen of the twenty areas (*see* Tr. 579–81).  He found "moderate" limitation in only two areas:  1) ability to maintain attention and concentration for extended periods, and 2) ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" (Tr. 579–80).  Additionally, in explaining the foregoing conclusions in narrative form, Dr. Peterson specifically opined that Plaintiff was "still able to sustain the mental demands of appropriate concentrated task-oriented activity," noting in relevant part Dr. Annis' findings and

---

[20] Unskilled work is work that requires "little or no judgment" and involves "simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a).  "The basic mental demands of . . . unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15. Semi-skilled work, on the other hand, requires "some skills," but does not involve "doing the more complex work duties" required in skilled work.  20 C.F.R. § 404.1568(b).

Plaintiff's limited history of psychological treatment (that is, treatment that largely consisted of conservative care by non-mental health specialists) (*see* Tr. 581).

Although the ALJ's hypothetical question did not recite verbatim the two specific moderate limitations assessed by Dr. Peterson, the question limited the hypothetical individual to only unskilled or low-end semi-skilled work. In including these limitations, the question largely accounted for the two moderate limitations suggested by Dr. Peterson and was otherwise consistent with (and in part more restrictive than) Dr. Peterson's opinions.[21] Moreover, Dr. Peterson's narrative clarifies his firm belief that Plaintiff was capable of performing "appropriate concentrated task-oriented activity," which is substantially consistent—albeit not identical—with the limitations included in the hypothetical question. Furthermore, Plaintiff was represented by counsel at the hearing and was provided with an opportunity to question the VE immediately following the ALJ's questioning of the VE (*see* Tr. 625). Counsel, however, made no attempt to modify the ALJ's hypothetical question to include limitations assessed by any of the state agency psychologists, including Dr. Peterson; rather, he inquired only about the hypothetical individual's need to lie down throughout the workday or miss more than one workday per month (*id.*). Thus, counsel did not deem the ALJ's hypothetical question sufficiently deficient—at least with regard to Plaintiff's mental limitations—to warrant further development at the hearing. *See* White v. Astrue, 240 Fed. Appx. 632, 634 (5th Cir. 2007) (citing Carey v. Apfel, 230 F.3d 131, 146–47 (5th Cir. 2000) ("claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing")). Accordingly, with regard to Dr. Peterson's opinions, Plaintiff has not established—nor does the record support a finding—that the

---

[21] For example, the ALJ's hypothetical question included a hypothetical individual that could perform unskilled work, and unskilled work requires an ability to "understand, carry out, and remember simple instructions." SSR 85-15 (emphasis added). Dr. Peterson opined, however, that Plaintiff was not significantly limited in her ability to understand and remember short, simple, instructions or detailed instructions (*see* Tr. 579). He also opined that Plaintiff was "not significantly limited in her ability to interact appropriately with the general public," although the ALJ restricted Plaintiff to only occasional contact with the public (Tr. 580).

ALJ posed an improper hypothetical question to the VE or otherwise erred in determining Plaintiff's RFC.

Plaintiff next asserts that the ALJ erred by failing to "address the first or second State Agency opinions [that is, the opinions of Dr. Himadi and Dr. Conger], which listed additional limitations" (Doc. 17 at 15). While acknowledging that their opinions were largely consistent with the opinions of Dr. Peterson (whose opinions were considered by the ALJ), Plaintiff asserts that the ALJ erred in failing to discuss or present to the VE the opinion that Plaintiff was limited to "simple, routine, repetitive, task performance" (Dr. Himadi's opinion) or "simple, repetitive tasks" (Dr. Conger's opinion) (*see* Doc. 17 at 15–16).

As with the opinions of Dr. Peterson, Plaintiff's counsel was given the opportunity to ask the VE to consider the opinions of Dr. Himadi and Dr. Conger but failed to do so, and thus, did not deem the exclusion of their opinions from the hypothetical question significant enough to merit any further adversarial development at the hearing. *See* White, 240 Fed. Appx. at 634. *See also* Hawkins v. Chater, 113 F.3d 1162, 1167 (10th Cir. 1997) (although an ALJ has a duty to develop the record, the claimant is also obligated, in some reasonable fashion, to raise the issue sought to be developed) (citation omitted). Counsel's failure to develop this issue below is especially egregious, as Plaintiff now asserts that the ALJ's failure to acknowledge (or discount) the limitation to "simple, routine, repetitive, task performance" is "outcome determinative" of the entire case because the jobs identified by the VE are not compatible with this limitation (Doc. 17 at 15–18). When a claimant is represented by counsel at the administrative hearing, the ALJ "should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." Hawkins, 113 F.3d at 1167. Or, as the Seventh Circuit has stated, "[w]hen an applicant for Social Security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits." Glenn v. Secretary of Health and Human Services, 814 F.2d 387, 391 (7th Cir. 1987); *see also* Fishburn v. Sullivan, 802 F. Supp. 1018, 1026 (S.D.N.Y. 1992) (same); Coats v. Bowen, 676 F. Supp. 939, 945 (W.D. Mo. 1987) (noting that claimant, who was represented by counsel at his hearing, "had ample opportunity to come forward with such evidence if he wished") (citing Glenn, 814 F.2d at 391). Thus, Plaintiff's failure to develop the instant issue below ought to be sufficient ground, in and of

itself, to deny Plaintiff relief on this claim. In abundance of caution, however, the undersigned will address the merits of the claim.

In support of the claim, Plaintiff has identified the "reasoning levels" (referred to by Plaintiff as "R1, R2, and R3"), as categorized and defined in the DOT, for each job identified by the VE that Plaintiff could perform (and which the ALJ found she could perform) (*see* Doc. 17 at 16–17; *see also* Tr. 24). Plaintiff then asserts that only an "R1" is consistent with Dr. Himadi and Dr. Conger's limitation to simple, repetitive, task performance, but of all the jobs identified by the VE are "R2" or greater (*id.*). However, in <u>Jones v. Apfel</u>, 190 F.3d 1224 (11th Cir. 1999), the Eleventh Circuit noted that "the DOT is not the sole source of admissible information concerning jobs" and that by its own wording "the SSA itself does not consider the DOT dispositive." *Id.* at 1230. Moreover, while Plaintiff has correctly identified the reasoning levels of the jobs identified by the VE, Plaintiff has offered no support for the proposition that <u>only</u> "R1s" correspond to simple, repetitive, task performance.[22] Although the R1 definition is consistent with such work, the definition contemplates occasional variables from that work. Furthermore, Dr. Conger—in addition to opining that Plaintiff was limited to simple, repetitive, tasks—specifically opined that Plaintiff was "not significantly limited" in her ability to understand, remember, and carry out both simple <u>and</u> detailed instructions (*see* Tr. 453)—which opinion is fully compatible with the definition of R2. Likewise, Dr. Himadi opined that Plaintiff was "not significantly limited" in her ability to understand, remember, and carry out simple instructions and only moderately limited in her ability to understand, remember, and carry out detailed instructions (Tr. 363), opinions that are largely consistent with the definition of R2. Additionally, both Dr. Himadi and Dr. Conger opined that Plaintiff was "not significantly" limited in her ability to make simple, work-related decisions (Tr. 363, 453), which indicates a belief that Plaintiff was not limited to "R1" standardized work, which work generally requires little to no decision making.

---

[22] R1 requires one to "Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." R2 requires one to "Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." And R3 requires one to "Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." *See* DOT's General Educational Development Scale (Appendix CII); *see also* Doc. 17 at 16 n.6.

In sum, the DOT is not dispositive of this claim, but even relying on its terms and definitions, the requirements of the jobs identified by the VE are substantially consistent with the opinions of Dr. Himadi and Dr. Conger, when all of their opinions are considered.[23] Thus, to the extent the ALJ erred by failing to include their opinion (that is, the limitation to simple, repetitive tasks) in the hypothetical question or RFC, or alternatively, discount the opinion, any such error is harmless. *See* East v. Barnhart, 197 Fed. Appx. 899, 901 n.3 (11th Cir. 2006) (failure to mention assessment's report harmless where findings in report were consistent with ALJ's ultimate determination); *see also* Pichette v. Barnhart, 185 Fed. Appx. 855, 856 (11th Cir. 2006) (ALJ's erroneous statements found to be harmless where ALJ applied proper legal standard); Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (misstatements harmless where ALJ applied correct legal standard despite the first misstatement, and the second misstatement was irrelevant).

Plaintiff next contends the ALJ erred in rejecting Dr. Decker's opinion that Plaintiff could not work due to her mental impairments, although Plaintiff contends it was actually the opinion of Dr. Renick that was rejected (Doc. 17 at 18). Regardless of who rendered the "unable to work" opinion (referred to hereafter as the "disability opinion"), the ALJ did not err in rejecting it. The disability opinion is recorded in Plaintiff's records two different ways: 1) by a handwritten notation on a treatment record dated November 12, 2002, that states Plaintiff "is unable to work due to depression and anxiety disorder," and 2) by checked boxes titled "unable to work" on four treatment records dated in July, October, and December 2003, and in March 2004 (Tr. 259, 254, 253, 252, 251). The ALJ rejected the disability opinion, noting it is not supported by objective findings and does not include any specific functional limitations that would preclude Plaintiff from working (*see* Tr. 22). Indeed, the disability opinion is a summary conclusion, devoid of any explanation and unsupported by objective findings. And it is proper for an ALJ to discount a treating physician's

---

[23] Indeed, in explaining their conclusions in narrative form, Dr. Himadi and Dr. Conger both stated that Plaintiff was primarily limited by her physical condition and that her mental condition did not preclude work (*see* Tr. 365, 451). Moreover, as previously noted, Dr. Conger did not believe Plaintiff was significantly limited at handling even detailed instructions, and neither Dr. Conger nor Dr. Himadi found Plaintiff limited in terms of social interaction, including interaction with the general public (Tr. 364, 453–54). Thus, in some important respects the ALJ's findings are more restrictive than the opinions of Dr. Himadi and Dr. Conger. Furthermore, it was logical for the ALJ to assign significant weight to Dr. Peterson's assessment, instead of the earlier similar assessments by Dr. Himadi or Conger, as his was the most recent of the three assessments and, therefore, based on the most comprehensive picture of Plaintiff's condition.

opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991). The ALJ also noted that the disability opinion is inconsistent with the opinions of Dr. Annis, whose assessment—in relevant part—did not preclude Plaintiff from all work activity, and the ALJ noted that no treating physician "issued a statement indicating that [Plaintiff] had specific functional limitations which would prevent her from engaging work activity" (*see* Tr. 22–23).[24] Continuing, the ALJ stated that the disability opinion is inconsistent with the opinions of Dr. Rowland (Tr. 22). Although the ALJ erroneously misinterpreted the meaning of the GAF score assessed by Dr. Rowland,[25] he did not err in concluding that Dr. Rowland's overall opinions did not preclude Plaintiff from work.

Thus, based on the foregoing, the undersigned concludes that the ALJ properly rejected the disability opinion, especially considering that the question of whether a claimant is disabled (that is, unable to work within the strictures of the Social Security Act) is reserved to the Commissioner, not to a physician. *See* 20 C.F.R. § 404.1503. Indeed, it is the physician's evaluation of a plaintiff's condition and the medical consequences thereof, "not their opinions of the legal consequences of his condition" on which the court must focus. Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997).

Finally, Plaintiff contends the ALJ erred in failing to further develop the record in light of the following statements in the record: 1) Dr. Annis' statement that, "[g]iven [Plaintiff's] history and interview presentation, [the ODD] may wish to consider evaluating intellectual functioning," and 2) Dr. Rowland's comments that Plaintiff's spelling suggests the likelihood of dyslexia, and her intellectual level may be in the borderline range (*see* Doc. 17 at 18–19 (citing Tr. 438; Tr. 361–62)). It is well established in the Eleventh Circuit that an ALJ has an affirmative duty to develop a full and fair record because administrative hearings are not adversary proceedings. Brown v. Shalala,

---

[24] Likewise, the evidence relied upon by the ALJ in discounting Plaintiff's complaints is evidence inconsistent with the disability opinion (including evidence demonstrating that Plaintiff was treated conservatively, she rarely sought specialized mental health treatment, her conditions were generally well controlled with medication, and she failed to seek any treatment for nearly a two-year period during the relevant period).

[25] As previously discussed, Dr. Rowland assessed a GAF score of 50, which is the highest score in the "serious symptoms" category (a score of 51, only one point higher, indicates moderate symptoms). Regardless, a GAF score, without evidence that it impaired the ability to work, does not establish an impairment. *See* Camp v. Barnhart, 103 Fed. Appx. 352, 354 (10th Cir. 2004).

44 F.3d 931, 934 (11th Cir. 1995); Lucas v. Sullivan, 918 F.2d 1567, 1573 (11th Cir. 1990); Smith v. Bowen, 792 F.2d 1547, 1551 (11th Cir. 1986); Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).  The ALJ's duty to develop the record exists even if, as in this case, the plaintiff is represented by an attorney.  Brown, 44 F.3d at 934 (citation omitted).  Nevertheless, it remains the plaintiff's burden prove that she is disabled, and she is responsible for producing evidence in support of her claim.  *See* Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003 (citing 20 C.F.R. § 416.912(a), (c)).  A record is full and fair, and need not be further developed, if the ALJ has sufficient evidence to decide the case.  Graham v. Apfel, 129 F.3d 1420, 1423 (11th Cir. 1997) (holding that where the record is complete and adequate to make a decision, no showing of prejudice is made).  Where the ALJ has sufficient information to decide the case the ALJ can do so.  Graham, 129 F.3d at 1423.  Furthermore, "there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded to the [Commissioner] for further development of the record."  *Id.*  In considering whether a remand is required, the court should be guided by whether there are evidentiary gaps in the record that result in unfairness or clear prejudice.  *Id.*  "The lack of medical and vocational documentation supporting an applicant's allegations of disability is undoubtedly prejudicial to a claim for benefits."  Brown, 44 F.3d at 935–36.

The court concludes that the evidence, as fully outlined above in this Report, supports a finding that the record was adequately developed.  Initially, it bears repeating the Plaintiff was sent to Dr. Annis and Dr. Rowland by the ODD.  Such referrals demonstrate compliance with the Commissioner's duty to develop the record and fill any "evidentiary gaps" that may have existed (and which gaps may have existed, in part, due to Plaintiff's failure to regularly pursue specialized mental health treatment).  The Commissioner also solicited the opinions of three non-examining agency psychologists.  Thus, the court is satisfied that the ALJ had sufficient evidence before him, including Plaintiff's treatment records and the reports of five agency physicians, to decide this case. Graham, 129 F.3d at 1423; Brown, 44 F.3d at 935–36.  Furthermore, Plaintiff has not alleged, much less shown, that she suffered any prejudice from the ALJ's failure to further investigate her intellectual functioning or suspected dyslexia, and no such prejudice can be discerned from a review of the record.  Indeed, the record belies any claim of prejudice.  For example, the record establishes

that Plaintiff was employed for many years, and there is no evidence that she developed dyslexia or suffered reduced intellectual capacities since she last worked; indeed, such conditions normally manifest at a young age. Moreover, three of the four jobs identified by the VE (as jobs Plaintiff could perform) are unskilled jobs, and there is nothing in the record to suggest that Plaintiff, even if she functions in the borderline range of intelligence or suffers from dyslexia, would be prevented from performing unskilled work. Thus, no prejudice has been shown, and such prejudice is required in order to obtain a remand for further development of the record. Accordingly, Plaintiff is not entitled to relief on this claim.

C.      Social Security Regulations 00-4p and 96-9p

As Plaintiff's final claim for relief, she asserts that the ALJ erred by failing to comply with SSRs 00-4p and 96-9p, which resulted in the "erroneous finding that [Plaintiff] can perform jobs with a general 'sit/stand option'" (Doc. 17 at 19). Plaintiff notes that SSR 00-4p imposes upon an ALJ the affirmative responsibility to ask about any possible conflict between the testimony of the VE and information found in the DOT (Doc. 17 at 19–20). Plaintiff then claims that the ALJ erred because he stated in his decision that the VE's testimony was consistent with DOT provisions, but it was actually inconsistent, and the ALJ did not address the issue with the VE (*id.* at 20). Continuing, Plaintiff notes that the VE failed to explain his testimony that all jobs he identified could be performed with a sit/stand option, and the "frequency of the alternation between positions in the sit/stand option was not stated either in the hypothetical question or the RFC findings," in violation of SSR 96-9p (an SSR relating to an RFC for sedentary work) (*see id.* at 20–21).

The court perceives no substantial conflict between the testimony of the VE and the provisions of the DOT pertaining to the sedentary jobs identified by the VE as being within Plaintiff's ability to perform (those are, the positions of surveillance system monitor and general clerk). According to the DOT, sedentary positions involve "sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met." DOT App. C, ¶ IVc (listings

379.367-010, 209.562-010). The DOT thus appears to take into account that a sedentary job involves periodically alternating between sitting and standing.[26]

Even if a conflict between the VE's testimony and the DOT exists, however, the ALJ did not err by failing to obtain an explanation from the VE for it. In Jones, 190 F.3d at 1224, the Eleventh Circuit held that "when the VE's testimony conflicts with the DOT, the VE's testimony 'trumps' the DOT." Id. at 1229–1230. The court reasoned that the VE's testimony may be accepted because "the DOT is not the sole source of admissible information concerning jobs" and that by its own wording "the SSA itself does not consider the DOT dispositive." Id. at 1230. Thus, under Jones an ALJ may rely upon the testimony of a VE without first resolving any conflict with the DOT. Although SSR 00-4p was promulgated in 2000, which was the year after Jones was decided, in 2007 the Eleventh Circuit revisited the issue in an unpublished decision, Miller v. Comm'r of Soc. Sec., 246 Fed. App'x 660 (11th Cir. 2007). The Miller court reiterated that agency rulings such as SSR 00-4p do not bind appellate courts. It stated that "[e]ven assuming that an inconsistency existed between the testimony of the vocational expert and the DOT, the ALJ did not err when, without first resolving the alleged conflict, he relied on the testimony of the vocational expert. Our precedent establishes that the testimony of a vocational expert 'trumps' an inconsistent provision of the DOT in this Circuit." Id. at 661–62 (citing Jones). Thus, even though SSR 00-04p was promulgated after Jones was decided, it does not mean the rule in Jones no longer applies. Moreover, SSR 00-04p does not expressly mandate that an ALJ independently investigate whether there is a conflict

---

[26] With regard to light work, the ALJ specifically found that Plaintiff could not perform the full range of light work due to "additional limitations" and, therefore, relied upon the VE's testimony in determining "the extent to which these [additional] limitations erode[d] the unskilled light occupational base" (see Tr. 24). The VE, after considering in relevant part the specific need of a sit/stand option, identified the light jobs of office helper and mail clerk. While Plaintiff acknowledges that SSR 96-9p does not apply to "light" work, she nevertheless asserts error, alleging that without knowing how often a person must alternate positions, it cannot be determined whether a job is properly classified as "light" or whether a person "would be able to perform the particular job tasks with a specific restriction" (see Doc. 17 at 21). Plaintiff's allegation is unpersuasive. The ALJ posed a proper hypothetical question to the VE, the VE is an expert on the kinds of jobs Plaintiff can perform based on her capacity and limitations, and the ALJ was justified in relying on the VE's testimony in finding Plaintiff not disabled. Phillips, 357 F.3d at 1240. Moreover, in an unpublished opinion the Eleventh Circuit addressed a nearly identical claim of error (that is, that an ALJ—after including a "sit/stand" limitation in a hypothetical question—erred by failing to state the frequency with which a claimant needed to alternate positions) and found no basis for relief. See Williams v. Barnhart, 140 F. Appx. 932, 937 (11th Cir. 2005) ("Although the ALJ failed to specify the frequency that Williams needed to change his sit/stand position, the reasonable implication of the ALJ's description was that the sit/stand option would be at Williams's own volition.").

between the VE's testimony and the DOT. Rather, SSR 00-04p merely requires that the ALJ ask the VE if there is a conflict; if the VE identifies a conflict only then must the ALJ address the conflict in his decision and resolve it. *See*, *e.g.*, Martin v. Comm'r of Soc. Sec., 170 Fed. App'x 369 (6th Cir. 2006); Haas v. Barnhart, 91 Fed. App'x 942, 947–48 (5th Cir. 2004). Accordingly, Plaintiff is not entitled to relief on this claim.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 25th day of August 2010.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**